**ANDERSON KILL & OLICK, P.C.**
1251 Avenue of the Americas
New York, New York 10020-1182
Todd E. Duffy
Dennis J. Nolan
Tel: (212) 278-1000
Fax: (212) 278-1733

*Proposed Counsel to the Debtors
   and Debtors-in-Possession*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>USA UNITED FLEET, INC.,<br>et al.,[1]<br><br>            Debtors. | Chapter 11<br><br>Case No. 11-45867<br><br>Joint Administration Requested |

**DECLARATION OF WILLIAM MORAN, COMPTROLLER OF
THE DEBTORS, IN COMPLIANCE
<u>WITH RULE 1007-4 OF THE LOCAL BANKRUPTCY RULES</u>**

I, William Moran, declare as follows:

      1.    I am the Comptroller each of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"),each having voluntarily filed for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") on July 6, 2011 (the "**Filing Date**").

---

[1] USA United Fleet, Inc. is also known as Shoreline Fleet, Inc. ("**United/Shoreline Fleet**"). In addition to United/Shoreline Fleet, the Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: USA United Holdings, Inc., a/k/a Shoreline Merge, Inc. ("**United Holdings**" or "**Shoreline Merge**"); United Tom Tom Transportation, Inc., a/k/a Shoreline Buses, Inc. ("**United Tom Tom**" or "**Shoreline Buses**"); USA United Bus Express, Inc., a/k/a Shoreline Bus Express ("**United Bus**" or "**Shoreline Express**"); USA United Transit, Inc., a/k/a Shoreline Pupil Transit, Inc. ("**United Transit**" or "**Shoreline Pupil**"); United Fleet, Inc. ("**United Fleet**"); Tom Tom Escorts Only, Inc. ("**Tom Tom Escorts**"); and Shoreline Transit, Inc. ("**Shoreline Transit**").

2. I submit this Declaration in support of the Debtors' voluntary petitions (the "**Petitions**") for relief under chapter 11 of the Bankruptcy Code, pursuant to Rule 1007-4 of the Local Rules of Bankruptcy Procedure for the Eastern District of New York.

3. Except as otherwise noted herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.

4. On the Filing Date, the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to remain in possession of their assets, operate their businesses and manage their affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5. No trustee, examiner or committee of creditors has been appointed in these cases.

6. None of the Debtors is a small business debtor as defined by section 101(51D) of the Bankruptcy Code.

7. The Debtors have never previously filed petitions for relief under the provisions of the Bankruptcy Code. The Debtors intend to propose an arrangement for reorganization pursuant to the provisions of chapter 11 of the Bankruptcy Code.

8. Annexed hereto as Schedule A is a schedule of the twenty (20) largest unsecured claims of the Debtors' estates.

9. The Debtors have the following secured creditors: (i) Comerica Bank ("**Comerica**"), 39200 Six Mile Road, Livonia, MI 48152; Secured Claim in the amount of $10,926,375.12 (which the Debtors' dispute); (ii) All Points Capital Corp, 275

Broadhollow Road, Melville, NY 11747; and the Internal Revenue Service. The value of the collateral secured by the assets described below is estimated at approximately $18.6 Million.

10. The Debtors' assets include: (a) bank accounts with a *de minimus* balance; (b) accounts receivable valued at approximately $5,465,000.00; (c) various machinery and equipment with an approximate value of $450,000.00; (d) various buses and other vehicles with an approximate value of $10,000,000.00; and (e) the Contract (defined below) with a value of $2,715,000.00.

11. A list of where the vehicles which make up the bulk of the Debtors' assets are located is annexed hereto as Exhibit B. The Debtor owns no assets that are physically located outside the United States.

12. None of the Debtors' shares are publicly held.

13. A list of the premises owned or leased from which the Debtors operate their businesses is annexed hereto as Schedule C.

14. On or about June 30, 2011, Comerica commenced an action in the United States District Court for the Eastern District of New York, Civil Action Number 11-0392 (RMM), against the Debtors for monies allegedly due under the loan documents, and seeking the appointment of a receiver to take control of the Debtors' assets.

15. The Debtors' senior management consists of: (a) Dennis Scialpi, President and Secretary; and (b) William Moran, Comptroller.

16. There is no property of the Debtor that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee or any other person.

17.     The Debtors' estimated gross payroll for the next thirty (30) days is expected to be approximately $3,800,000.

18.     Annexed hereto as Schedule D is a Budget for the thirteen (13) week period after the filing of the Petitions.

**Nature of the Debtors' Businesses and Statement of
Circumstances Leading to the Debtors' Chapter 11 Filings**

19.     The Debtors compromise a family-owned operation that has been in business for more than thirty years.  United Fleet and the other Debtors are wholly owned direct and indirect subsidiaries of United Holdings, a holding company whose primary asset is the stock it holds in the Debtors.  The Debtors, other than United Holdings, operate as one of the largest providers of school bus transportation to the New York City Department of Education (the "**DOE**") (the "**School Bus Branch**").

20.     The Debtors currently have six (6) contracts with the DOE which, taken together, accounted for 100% of the Debtors' revenues from all of its transportation operations in fiscal year 2010.

21.     In addition to the School Bus Branch, the Debtors provide transportation for pre-kindergarten children, express commuter line services, and charter and tour bus services.

22.     The Debtors currently have a fleet of more than 400 vehicles operating from three different facilities, with its main operating facility located at 2859 W. 37th Street, Brooklyn, New York 11224.  The Debtors maintain their corporate headquarters at 150 L Greaves Lane, Suite 412, Staten Island, New York 10308.

23. The Debtors generated annual revenues of approximately $88.9 Million on a consolidated basis. As of June 30, 2011, the Debtors' consolidated books and records reflected assets totaling approximately $18,630,000.00, exclusive of goodwill.

24. The Debtors currently employ over 1,188 people – 559 drivers, 563 escorts (for the pre-kindergarten vehicles), 54 shop employees, and 12 executive and administrative employees. The drivers and escorts are members of the Amalgamated Transit Union Local 1181-1061, AFL-CIO (the "**Union**"). Certain of the Debtors are parties to a collective bargaining agreement with the Union (the "**CBA**") that requires the Debtors to make certain contributions to pension and welfare funds (the "**Contributions**") on behalf of the employees covered by the CBA.

25. The Debtors' operations are seasonal in nature. Historically, the first quarter of the Debtors' fiscal year (ending September 30) generates less operating profit due to significantly reduced revenues of the School Bus Branch, during the summer months. As would be expected, the Debtors' school bus contracts generally resume in late August and early September.

**Events Leading To the Chapter 11 Filing**

26. The Debtors have simply fallen victim to a trifecta of circumstances that have crippled their more than thirty year old business. First, the Debtors lost millions of dollars to a payroll service that embezzled money entrusted to them by the Debtors to pay various taxing authorities. Second, the Union has demanded a "security deposit" although there is no authority under the governing contract to demand any deposit, let alone one of such magnitude. Finally, the Debtors' senior secured lender made various unilateral adjustments to the original notes and then charged the Debtors more than

$1,000,000. Notwithstanding these challenges, the Debtor has remained solvent and in business. Yet, even the most solvent of businesses has its breaking point. Here, with the loss of available cash in the amount of almost $10,000,000, it is only a surprise that a petition was not filed sooner.

The Embezzlement by TSE-PEO, Inc.

27. In or around 2004, the Debtors engaged TSE-PEO, Inc. to perform services related to, *inter alia*, the calculation, collection, and submission of employment taxes and filings due upon behalf of the Debtors. Indeed, TSE-PEO was responsible for the payment of wages and other compensation to the Debtors' employees and was required to deduct and remit to the proper taxing authority all local, state and federal taxes and all forms required of an employer.

28. In exchange for the services promised by TSE-PEO, the Debtors agreed and paid a percentage applied to the sum total of the gross wages paid by TSE-PEO.

29. Although TSE-PEO collected almost $2 million in taxes, it failed to turn them over to the taxing authorities or file the appropriate returns with the appropriate taxing authorities. As a result, despite having collected the taxes from the Debtors and their employees, the appropriate taxing authorities have accrued interest and levied penalties against the Debtors in the aggregate amount of approximately $5 million.

30. The Debtor United Holdings commenced an action against TSE-PEO, its President, Robert Cassera, and several related entities of TSE-PEO, in the Supreme Court of the State of New York, County of Kings, Index No. 9909/08, asserting causes of action for breach of contract, breach of fiduciary duty, and conversion based on TSE-

PEO's actions. After denial of TSE-PEO's motion to dismiss, discovery is proceeding in that litigation.

**Local 1181 Union Controversy**

31. On or about July 1, 2010, the Debtors United Fleet, United Transit, and United Express, along with the non-Debtor entity Tom Tom Escorts Only, Inc. ("**Tom Tom Escorts**"), entered into the six (6) contracts to provide bus transportation services for the DOE (collectively referred to as the "**Contract**"). The Debtors' business is derived entirely from this Contract. Union employees provide the services necessary to satisfy the Contract requirements.

32. Pursuant to the Contract, if the Debtors defaulted in the payment of any obligation, the Union could seek the Contributions directly from the DOE from receivables the DOE owes to the Debtors under the Contract.

33. Due to the DOE's delays in paying amounts owed under the Contract for August and September 2010, the Debtors were unable to timely pay the Contributions for these months. On November 2, 2010, the Union demanded that the Debtors make all future Contributions in certified funds and requested a payment security bond in lieu of a security deposit. The Debtors wired the Union the funds for the welfare Contributions and delivered checks to the Union for the pension Contributions for November and December 2010. On or around December 25, 2010, the Debtors wired the welfare Contribution and delivered a check for the pension Contribution to the Union's security department.

34. On or about January 5, 2011, without notice to the Debtors, the DOE withheld $1,159,668.70 from the Debtors' funds due under the Contract for the benefit

of the Union.  The Union alleged to the DOE that the Debtors underpaid various pension and welfare benefits relating to the December 2010 Contributions.  Because there was no notice of either the withholding or the diversion of funds to the Union, the Debtors had no opportunity to protest or investigate the Union's allegations.  As a result of the December welfare Contribution and the attachment by the DOE of the funds, the Debtors overpaid the Union by $800,000, which had a crippling effect on the Debtors' operations.

35. The Debtors' financial struggles intensified when, again because of the DOE's delays in paying amounts owed under the Contract, the Debtors were unable to pay the monthly Contribution for March 2011.

36. In addition, in or about April 2011, the Union attached $363,548.60 of the Debtors' funds allegedly because of a random payroll audit of Debtor United Transit that revealed additional contributions allegedly due from prior periods.

37. Furthermore, the Union demanded $1,213,744.19 in cash for a security deposit after rejecting an apparently agreed-to compromise allowing the Debtors to bond any security deposit.  The DOE intends to attach the funds at issue.

38. As a result of the Union's actions, on or about April 27, 2011, the Debtors United Fleet, United Transit, United Express, and Tom Tom Escorts, commenced an action against the Union and the New York City Department of Education in the Supreme Court of the State of New York, County of Richmond.  The Union and the DOE removed the action to the United States District Court for the Eastern District of New York, where the action is pending under Civil Case Number 11-CV-2140 (NGG).

**The Comerica "Adjustment"**

1. The Loan Agreement

39. On or about June 17, 2004, Debtors United Holdings, United Tom Tom, United Bus, United Transit and United Fleet (collectively, the "**Companies**") entered into a loan agreement with Comerica pursuant to which Comerica agreed to lend $10 million to the Companies (the "**Original Loan Agreement**").

40. On or about October 30, 2007, the Companies executed an Amended and Restated Loan Agreement (the "**Restated Loan Agreement**") with Comerica. The Restated Loan Agreement amended and restated the Original Loan Agreement in its entirety.

41. On or about April 21, 2010, the Companies and Comerica agreed to amend the Restated Loan Agreement (the "**Amended Loan Agreement**" and, collectively with the Original Loan Agreement and the Restated Loan Agreement, the "**Loan Agreement**"). Pursuant to an April 21, 2010 Assumption Agreement (the "**Assumption Agreement**"), Shoreline Merge assumed all of the obligations of its predecessor United Holdings to Comerica under the Amended Loan Agreement.[2] On April 21, 2010, Shoreline Transit executed a Joinder Agreement (the "**Joinder Agreement**") whereby it became a party to the Amended Loan Agreement.

42. Pursuant to certain Modifications, dated April 21, 2010, Comerica and Shoreline Buses, Shoreline Express, Shoreline Pupil, and Shoreline Fleet agreed that

---

[2] Shoreline Merge is the successor by merger to United Holdings; Shoreline Bus was f/k/a United Tom Tom; Shoreline Express was f/k/a United Express; and Shoreline Pupil was f/k/a United Transit; Shoreline Fleet was f/k/a USA United Fleet.

the names on the Amended Loan Agreement and all related documents would be changed to reflect the name changes to these entities.

2. The Notes

43. On or about June 17, 2004, in connection with the Original Loan Agreement, United Holdings, United Tom Tom, United Bus, United Transit, United Fleet and United/Shoreline Fleet each executed a term promissory note in favor of Comerica in the original principal amount of $10,000,000.00 (the "**2004 Term Note**"). The 2004 Term Note was later made subject to the Amended Loan Agreement.

44. On or about April 21, 2010, in connection with the Amended Loan Agreement, each Borrower executed: (1) a demand note in favor of Comerica in the original principal amount of $3,000,000.00; (2) a promissory note in favor of Comerica in the original principal amount of $1,050,000.00; and (3) a promissory note in favor of Comerica in the original principal amount of $4,109,237.05 (collectively, the "**Notes**").

3. The Security Agreements

45. To secure the repayment of the loans made by Comerica under the Amended Loan Agreement and the Notes, each Borrower executed a security agreement in favor of Comerica (collectively, the "**Security Agreements**").

46. The Security Agreements grant Comerica a first priority security interest in, and lien upon, substantially all assets of each respective Borrower, including, but not limited to, all accounts, general intangibles, inventory, equipment, fixtures, software, goods, money, deposits, and all products and proceeds of the foregoing as more fully set forth in the Security Agreements (the "**Collateral**"), including the Debtors' vehicles.

4. Alleged Default

47. Finally, in or around April 2011, Comerica issued revised notes as a result of unlateral changes in the credit structure and timing of the effective date of various notes as opposed to the actual date the notes were processed. As a result of these "adjustments", Comerica charged the Debtors more than $1.5 million. On or about April 20, 2011, Comerica sent a notice declaring the Debtors in default on the loan. As of today, Comerica claims that the Debtors owe over $10 million in principal and interest under the loan facility. The Debtors and their professionals are currently investigating to determine whether or not these adjustments were warranted.

48. On or about June 21, 2011, Comerica sent a Notice of Assignment of Accounts Receivable and Direction to Pay Comerica Bank to the DOE requesting that the DOE make a $5,000,000.00 payments due to the Debtors for accounts receivables owed pursuant to the Contract directly to Comerica.

49. Concurrently, the DOE is awaiting the advice of counsel to determine exactly to whom it will pay the $5,000,000.00.

50. If the DOE makes this payment to Comerica, the Debtors will be dealt a fatal blow.

51. Notwithstanding all of these challenges, the Debtors have continued to maintain their business and pay their creditors as they have come due. Yet, even the most solvent of businesses have problems when significant revenue is involuntarily taken. The Debtors are no exception.

52. However, the Debtors believe that with the protections of this Court and the Bankruptcy Code, they will be able to restructure their businesses and debts and

propose a meaningful and acceptable plan of reorganization, which may include a sale of their assets.

53. I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct to the best of my personal knowledge.

Executed this 5th day of July 2011

By:    /s/ William Moran<br>
William Moran<br>
Comptroller

# SCHEDULE A
## CONSOLIDATED LIST OF 20 LARGEST UNSECURED CREDITORS

| CREDITOR | ADDRESS | AMOUNT |
|---|---|---|
| 2978 Gas Corp. | 2978 Cropsey Avenue<br>Brooklyn, NY 11214 | $101,875.00 |
| Anthony Cincotta P.C. | 100 Crossways Park Drive W # 101<br>Woodbury, NY 11797 | $350,000.00 |
| Bruckner/Virginia Service Station | 1929 Bruckner Blvd<br>Bronx, NY 10472 | $304,451.00 |
| Cadi Auto Parts Inc. | 25 Millpond Parkway<br>Monroe, NY 10950 | $28,224.00 |
| Factory Direct Bus Sales | 135 Haven Avenue<br>Port Washington, NY 11050 | $4,362.04 |
| J&J Towing Corp. | 1227 McDonald Avenue<br>Brooklyn , NY 11230<br>660 Gulf Ave<br>Staten Island, NY 10314 | $17,241.11 |
| Mr Bargain Auto Parts | 1083 60th Street<br>Brooklyn, NY 11219 | $128,029.40 |
| Ridge Transport Systems | 2743 Stillwell Avenue<br>Brooklyn, NY 11224 | $2,565.00 |
| Runway Tire Service Co., Inc. | 41-15 19th Avenue<br>Astoria , NY 11105 | $58,725.47 |
| Surf Management LLC | 1412 Avenue M, Ste 2423<br>Brooklyn, NY 11230 | $82,687.50 |
| Wright Express | 97 Darling Avenue<br>South Portland, ME 04106 | $155,231.00 |
| 1981 Gas Corp. | 90 Sugar Maple Drive<br>Roslyn, NY 11576 | Unknown |
| 2001 Neptune Fuel Stop | W 20th Street<br>Brooklyn, NY 11224 | $87,786.00 |
| GCS Transmissions | 1227 McDonald Avenue<br>Brooklyn, NY 11230 | $2,230.00 |
| Naughton Energy Corp. | 40 Harrison St<br>New York, NY 10013 | $65,608.57 |
| Pro 1 Tire Service Inc. | 781 4th Avenue<br>Brooklyn, NY 11232 | $908.00 |
| Sovereign Bank | 1130 Berkshire Boulevard<br>Wyomissing, PA 19610 | $29,590.26 |
| Storage Deluxe | 945 Atlantic Avenue<br>Brooklyn, NY 11238 | $60,907.84 |
| Reliable Transmissions | 6337 Metropolitan Avenue<br>Middle Village, NY 11379 | $31,750.00 |

NYDOCS1-970726.2

SCHEDULE B

LOCATION OF DEBTORS' VEHICLES

1. 2859 West 37th Street
   Brooklyn, New York 11224

2. 1625 Surf Avenue
   Brooklyn, New York 11224

3. 98 Lincoln Avenue
   Bronx, New York 10454

# SCHEDULE C

# LIST OF PREMISES LEASED BY DEBTORS

1. 2859 West 37th Street
   Brooklyn, New York 11224

2. 1625 Surf Avenue
   Brooklyn, New York 11224

3. 98 Lincoln Avenue
   Bronx, New York 10454

SCHEDULE D

13-WEEK BUDGET

**USA United Fleet, Inc.**
**DIP Cash Flow Projection**
**For the 13 Weeks Ended 9/30/11**

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Weeks 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 7/8/2011 | 7/15/2011 | 7/22/2011 | 7/29/2011 | 8/5/2011 | 8/12/2011 | 8/19/2011 | 8/28/2011 | 9/2/2011 | 9/9/2011 | 9/16/2011 | 9/23/2011 | 9/30/2011 | Total |
| School Calendar | S | S | S | S | S | S | N | N | N | F | F | F | F | |
| **Beginning Cash Balance** | $ - | $3,763,231 | $3,536,975 | $3,272,459 | $2,858,878 | $2,238,834 | $2,911,349 | $2,989,792 | $1,716,587 | $1,512,434 | $4,783,797 | $4,387,381 | $3,298,303 | $ - |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Restricted Funds | 214,424 | - | - | - | - | - | - | - | - | - | - | - | - | 214,424 |
| Net Receipts of Accounts Receivable | | | | | | | | | | | | | | |
| Gross Billed Vehicle Revenue | 5,465,827 | - | - | - | - | 838,165 | - | - | 363,375 | - | - | - | - | 6,667,367 |
| Less DOE Insurance Deduction | (111,945) | - | - | - | - | (85,000) | - | - | (65,000) | - | - | - | - | (261,945) |
| Less Estimated DOE Liquidated Damages Deduction | (40,000) | - | - | - | - | (2,750) | - | - | (1,375) | - | - | - | - | (44,125) |
| Net Vehicle Receipts | 5,313,882 | - | - | - | - | 750,415 | - | - | 297,000 | - | - | - | - | 6,361,297 |
| Escort Revenue | - | - | - | - | - | 227,800 | 583,668 | - | - | 2,643,883 | 583,668 | - | - | 4,039,019 |
| Charter Revenue | - | 7,100 | - | - | - | 7,100 | - | - | - | - | 3,550 | - | - | 17,750 |
| Federal Tax Refunds | - | - | - | - | - | - | - | - | - | 698,628 | - | - | - | 698,628 |
| State Tax Refunds | - | - | - | - | - | - | - | - | - | 154,412 | - | - | - | 154,412 |
| Union Security Deposit Refund | - | - | - | 1,213,744 | - | - | - | - | - | - | - | - | - | 1,213,744 |
| Union Audit Overpayments | - | - | - | 411,000 | - | - | - | - | - | - | - | - | - | 411,000 |
| **Total Cash Receipts** | 5,528,306 | 7,100 | - | 1,624,744 | - | 985,315 | 583,668 | - | 297,000 | 3,496,923 | 587,218 | - | - | 13,110,274 |
| **Ooperating Disbursements** | | | | | | | | | | | | | | |
| Costs of Labor | | | | | | | | | | | | | | |
| Gross Payroll & Payroll Taxes | 1,214,340 | 149,310 | 149,310 | 149,310 | 149,310 | 149,310 | 149,310 | 28,214 | 28,214 | 28,214 | 575,572 | 959,276 | 959,287 | 4,688,977 |
| Union Contributions | 32,068 | - | - | 1,793,070 | 32,068 | - | - | 1,167,336 | 32,068 | - | - | - | 1,167,336 | 4,223,946 |
| Worker's Compensation Insurance | 56,903 | - | - | - | 56,903 | - | - | - | - | - | - | - | - | 113,806 |
| Vehicle Expenses | | | | | | | | | | | | | | |
| Fuel | 18,291 | 18,291 | 18,291 | 18,291 | 18,291 | 18,291 | - | - | 52,147 | 52,147 | 52,147 | 52,147 | - | 318,334 |
| Vehicle & GL Insurance | 61,639 | - | - | - | 61,639 | - | - | - | 61,639 | - | - | - | - | 184,917 |
| Repairs & Maintenance | 45,948 | 45,948 | 45,948 | 45,948 | 45,948 | 45,948 | 45,948 | 45,948 | 45,948 | 45,948 | 45,948 | 45,948 | - | 551,376 |
| Tolls | 33,868 | - | - | - | 3,868 | - | - | - | 29,120 | - | - | - | - | 66,856 |
| Operating Expenses | | | | | | | | | | | | | | |
| Rent | 89,000 | - | - | - | 89,000 | - | - | - | 89,000 | - | - | - | - | 267,000 |
| Utilities | - | - | - | 9,020 | - | - | - | 9,020 | - | - | - | 9,020 | - | 27,059 |
| Office leases & supplies | - | - | 2,253 | - | - | - | 2,253 | - | - | - | 2,253 | - | - | 6,759 |
| Telephone Communications | - | - | - | 7,894 | - | - | - | 7,894 | - | - | - | 7,894 | - | 23,682 |
| Radio Communications | - | - | - | 1,528 | - | - | - | 1,528 | - | - | - | 1,528 | - | 4,584 |
| Training & Licensing | - | - | 13,714 | - | - | - | 13,714 | - | - | - | 13,714 | - | - | 41,142 |
| Computer & Internet | - | - | - | 3,265 | - | - | - | 3,265 | - | - | - | 3,265 | - | 9,795 |
| Ordinary course Professional Fees | - | - | - | - | - | 85,000 | - | - | - | 85,000 | - | - | - | 170,000 |
| Utility Taxes | - | 9,807 | - | - | - | 4,251 | - | - | - | 4,251 | - | - | - | 18,309 |
| Bank Charges | 3,017 | - | - | - | 3,017 | - | - | - | 3,017 | - | - | - | - | 9,051 |
| **Total Operating Disbursements** | 1,555,075 | 223,356 | 229,516 | 2,028,326 | 460,044 | 302,800 | 211,225 | 1,263,205 | 341,153 | 215,560 | 689,634 | 1,079,078 | 2,126,623 | 10,725,594 |
| **Net Cash Flow Before Restructuring Expenses** | 3,973,231 | (216,256) | (229,516) | (403,582) | (460,044) | 682,515 | 372,443 | ####### | (44,153) | 3,281,363 | (102,416) | (1,079,078) | (2,126,623) | 2,384,680 |
| Restructuring Expenses | | | | | | | | | | | | | | |
| Utility Deposits | - | - | 25,000 | - | - | - | - | - | - | - | - | - | - | 25,000 |
| Other Deposits | 200,000 | - | - | - | - | - | - | - | - | - | - | - | - | 200,000 |
| U.S. Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | 13,000 | 13,000 |
| Professional Fees | - | - | - | - | 150,000 | - | 284,000 | - | 150,000 | - | 284,000 | - | - | 868,000 |
| Contingency | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 130,000 |
| **Total Restructuring Expenses** | 210,000 | 10,000 | 35,000 | 10,000 | 160,000 | 10,000 | 294,000 | 10,000 | 160,000 | 10,000 | 294,000 | 10,000 | 23,000 | 1,236,000 |
| **Total Net Cash Flow** | 3,763,231 | (226,256) | (264,516) | (413,582) | (620,044) | 672,515 | 78,443 | (1,273,205) | (204,153) | 3,271,363 | (396,416) | (1,089,078) | (2,149,623) | 1,148,680 |
| **Ending Balance** | $ 3,763,231 | $3,536,975 | $3,272,459 | $2,858,878 | $2,238,834 | $2,911,349 | $2,989,792 | $1,716,587 | $1,512,434 | $4,783,797 | $4,387,381 | $3,298,303 | $ 1,148,680 | $ 1,148,680 |