**ANDERSON KILL & OLICK, P.C.**
1251 Avenue of the Americas
New York, New York 10020-1182
Todd E. Duffy
Dennis J. Nolan
Tel: (212) 278-1000
Fax: (212) 278-1733

*Proposed Counsel to the Debtor
and Debtor-in-Possession*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>USA UNITED FLEET, INC.,<br><br>Debtors. | Chapter 11<br><br>Case No. 11-45867 (JF)<br><br>Joint Administration Requested |

**MOTION OF THE DEBTORS FOR ORDER: (i) PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE FOR ENFORCEMENT OF THE AUTOMATIC STAY WITH RESPECT TO THE NEW YORK CITY DEPARTMENT OF EDUCATION; OR, IN THE ALTERNATIVE (ii) AUTHORIZING A MERGER OF VARIOUS DEBTOR ENTITES WITH THE NORTHEAST ENTITIES**

TO: THE HONORABLE JEROME FELLER
UNITED STATES BANKRUPTCY JUDGE

USA United Fleet, Inc., the above-referenced debtor and debtor-in-possession,

together with its affiliated entities[1] (collectively, the "**Debtors**"), by and through its

---

[1] USA United Fleet, Inc. (a/k/a Shoreline Fleet, Inc.") is affiliated with the following Debtor entities: USA United Holdings, Inc. (a/k/a Shoreline Merge, Inc.) – Case No. 11-45868; United Fleet, Inc. – Case No. 11-45869; United Tom Tom Transportation, Inc. (a/k/a Shoreline Buses, Inc.) - Case No. 11-45872; USA United Bus Express, Inc. (a/k/a Shoreline Bus Express) - Case No. 11-45873; USA United Transit, Inc. (a/k/a Shoreline Pupil Transit, Inc.) - Case No. 11-45875; Tom Tom Escorts Only, Inc. - Case No. 11-45876; and Shoreline Transit, Inc. - Case No. 11-45877. USA United Fleet, Inc. has filed a motion seeking Joint Administration of these Debtor cases.

proposed counsel, Anderson Kill & Olick, P.C., files this motion (the "**Motion**") pursuant to section 362 of chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101-1552) (the "**Bankruptcy Code**") to enforce the automatic stay with respect to the New York City Department of Education (the "**DOE**") or in the alternative, to authorize a merger of various Debtor entities with the Northeast Entities. In support of the Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Debtors' bankruptcy cases are on life support. The Debtors have no cash to pay their bus drivers, other employees or ordinary course of business expenses. This is due in no small part to the uncertainty regarding the ownership of the Debtors' largest asset: their Contracts (defined below) with the DOE. Rather than helping to clarify the situation, the DOE has sought to obfuscate. Never definitively stating that the Assignment (defined below) has or has not occurred, or whether the Assignment is or is not effective, the DOE hedges its bets – all the while creating an air of uncertainty. As a direct result of this confusion, Comerica Bank – the Debtors' largest secured creditor – revoked a fully negotiated and agreed upon consensual interim cash collateral order that would have allowed the Debtors' employees (including the bus drivers) to be paid last Friday and the children of New York City to be safely and reliably bused from their homes to their schools and summer camps. Now, due to the DOE's muddying of the waters, Comerica has stated that it will not consent to the use of cash collateral until this issue has been resolved.

2. While the Court, at the July 11, 2011 hearing, urged the DOE to work with the Debtors to clarify whether the Contracts actually left the estate or to agree to a way

to return those Contracts to the estate, the Debtors' efforts to obtain that consent were summarily rejected.

3. Instead, counsel for the DOE has stated that although he declared in Court that the Contracts will not effectively transfer until July 18, 2011, he did not mean to say that. Without clarifying what he actually meant, he informed Debtors' counsel that, although he is an attorney representing the DOE in a Federal Bankruptcy Court, the City cannot be bound by the statements he makes before the Court in this proceeding notwithstanding the fact that the DOE is acting in a market capacity. See Exhibit 1 annexed hereto. Of course, this would not resolve the problem of how to bring the Contracts back into the Debtors' estates, but it does highlight the continued obfuscation by the DOE. This obfuscation is even more ludicrous considering that the bus drivers are employees certified to be drivers and escorts by the City of New York – one would expect that the DOE would make every effort to remove all obstacles to getting the bus drivers paid instead of creating barriers to their receiving their hard earned pay. It is unfortunate that the Debtors have arrived at a place where, in order to obtain payment for the bus drivers, they must fight the very entity ultimately responsible for the well-being of the school children of New York City.

4. The reality is that these Contracts did not transfer away from the Debtors. All relevant information sources where the average vendor would report the change of the ownership of the Contracts continue to report that the Debtors retain ownership of the Contracts. See Exhibit 2 annexed hereto. Mr. Hugh Shull, Esq. – representing the DOE – stood up before this Court and stated on the record that the Northeast Entities

(defined below) will not be responsible for providing services under the Contracts until July 18, 2011.

5.  In addition to Corporation Counsel's colloquy with the Court, emails from the DOE to the Northeast Entities confirm that the Assignment is not effective: "Please be advised of the following information and/or documentation that is required prior to the United Assignment taking effect." See Exhibit 3 annexed hereto. Among the documents Northeast is required to provide to the DOE in order for the Assignment to be effective is an Escort Service Guaranty Bond, under which the Board of Education and the City of New York are named insureds, and which is a material requirement in the Contracts for a party electing reimbursement of escort costs, like the Northeast Entities. This amounts to more than a ministerial act, as the DOE must analyze the information and documents provided and, if those documents are insufficient, can apparently refuse to effectuate the Assignment. All of these facts point to the only conclusion: the transfer of the Contracts will not be final until at least July 18, 2011 and now – as a result of the automatic stay – cannot become effective.

6.  Even if the transfer of the Contracts did become effective – which it did not – Mr. William Moran, the beneficial owner of 100% of the interests of both the Debtors and the alleged non-debtor owner of the Contracts, has agreed to merge the Northeast Entities with the Debtors in order to bring the Contracts back into the Debtors' estates. While this would be an "outside the ordinary course of business" transaction requiring Court approval, it would be in the best interest of creditors and a beneficial use of estate property. Accordingly, regardless of the method applied, this Court must enter the relief

sought as quickly as possible so that, at the very least, the Debtors will be able to pay their bus drivers and employees.

## JURISDICTION

7. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.

8. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

9. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105, 362, and 363.

## BACKGROUND

10. On July 6, 2011 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief pursuant to chapter 11 of the Bankruptcy Code.

11. The Debtors continue to operate their business and manage their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in the Debtors' case.

12. The Debtors are a family-owned operation that has been in business for more than thirty years. The Debtors operate as one of the largest providers of school bus transportation to the DOE.

13. In or about 2004, the Debtors entered into six (6) Contracts with the DOE pursuant to which the Debtors provide school bus services on 540 routes (collectively, the "**Contracts**"). The Contracts, taken together, account for 100% of the Debtors' revenues. The Debtors own a fleet of more than 600 vehicles in connection with its business.

14. On or about August 5, 2010, prior to the Petition Date, the Debtors agreed to assign the Contracts (the "**Assignment**") to Northeast Transit, Inc.; Northeast Buses, Inc.; and Northern Transit, Inc. (collectively, the "**Northeast Entities**") upon approval of the DOE. The Assignment included all rights with respect to the bus routes granted to the Debtors by the DOE. The parties agreed to submit any and all applications and documentation required by the DOE to obtain the approval of the assignment of the DOE Contracts.

15. The Debtors and the Northeast Entities submitted the Assignment for approval and subsequent certification and registration within the DOE. Between August 4, 2010 and July 1, 2011, the Debtors took several steps to determine whether the transfer of the Contracts had been completed. Aside from calling the DOE repeatedly, the Debtors hired a consultant who was a former DOE employee to help shepherd the Assignment through the normal channels. Each time the Debtors or their consultant contacted the DOE, they were advised that the registration was not completed and that the DOE did not know when or if the registration would be completed. The last call made by either the Debtors or their advisor to determine the state of the assignment was made on June 30, 2011. At that time, the DOE again stated that it had no idea if the Assignment was registered and that it had not been registered as of that date and did not know if the Contracts had reached the Comptroller's office. After the DOE spent more than four months refusing to give the Debtors any information on the status of the Assignments, the Debtors reluctantly accepted that the DOE would never register the Assignments and filed their petitions on July 6, 2011.

16. Without notice to anyone outside the DOE, on July 1, 2011, the DOE certified and registered the Assignment. All relevant parties to this dispute learned of the purported registration of the Assignment the night of July 7, 2011.

17. On July 4, 2011, Dana Pristavec, the sole shareholder of the Debtors, conveyed all of her interest in the Debtors to William Moran.

18. On July 5, 2011, the DOE sent an email to William Moran stating that before the Assignment could take effect, additional information and/or documentation would be required by the DOE. See Exhibit 3 annexed hereto. Mr. Moran, unaware that the registration had occurred, believed that the DOE required this information in advance of registration. While Mr. Moran sent some of the requested documents, the remainder of those document requests remain outstanding, including, but not limited to, the Guaranty Bond.

19. On July 8, 2011, at a hearing before the Court on the Debtor's motion authorizing use of cash collateral (the "**Cash Collateral Motion**"), and the accompanying employee wages motion, an attorney for the City of New York, Hugh Shull, Esq., represented to the Court that the Assignment was registered, but that the Northeast Entities would not be responsible for providing services to the City of New York until July 18, 2011. Based in large part on Mr. Shull's representations, the Court adjourned the Cash Collateral Motion without entering an order that would have allowed the Debtor's employees to be paid. Until July 18, 2011, the Debtor continues to operate the buses on the routes and collect the receivables from the DOE under the Contracts.

20. Indeed, although Mr. Shull has refused to clarify exactly what he meant, it is apparent that as of this date, the Debtors are expected to fulfill various obligations

under a contract that Mr. Shull vaguely represents may have been transferred to the Northeast Entities. Thus, it seems that the Debtors' contracts have not been transferred as represented by the City of New York.

## RELIEF REQUESTED

21. The Debtor requests that the Court enforce the automatic stay and enjoin the DOE from attempting to enforce the Assignment. In the alternative, the Debtors request that the Court authorize them to merge with the Northeast Entities for the sole purpose of allowing the Contracts to come back into the Debtors' estates. Because Mr. Moran is the 100% owner of both the Debtors are the Northeast Entities and pursuant to the plain language of the extension agreement no 13, page 37, Mr. Moran does not need DOE approval to transfer his interest in the Northeast Entities.

## BASIS FOR RELIEF REQUESTED

22. As a result of the commencement of the Debtors' chapter 11 case, and by operation of law pursuant to section 362 of the Bankruptcy Code, the automatic stay enjoins all persons and all governmental units from, among other things: (a) commencing or continuing any judicial, administrative, or other proceeding against the Debtors that was or could have been initiated before the Debtors's chapter 11 case was commenced; (b) recovering upon a claim against the Debtor that arose before the commencement of the Debtor's chapter 11 case; and (c) taking any action to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. *See* 11 U.S.C. § 362(a).

23. The injunction contained in section 362 of the Bankruptcy Code is self-executing. It constitutes a fundamental debtor protection that, in combination with other

provisions of the Bankruptcy Code, provides the Debtor with the breathing spell that is essential to the Debtor's ability to reorganize successfully. *See, e.g., Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F.Supp. 603, 608 (S.D.N.Y. 1996) ("[Section] 362 is meant to give 'the debtor a breathing spell from his creditors [and]...permit [] the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.'") (quoting the legislative history of Section 362).

24. The protections of the automatic stay apply to a debtor's property wherever it is located and by whomever held. *See, e.g., Underwood v. Hilliard (In re Rimsat, Ltd.)*, 98 F.3d 956, 961 (7th Cir. 1996) (bankruptcy court's *in rem* jurisdiction over property of the estate permits injunctions against foreign proceedings pursuant to the automatic stay).

25. The stay of section 362 is extremely broad in scope and, aside from the limited exception of subsection (b), applies to almost any type of formal or informal action taken against the debtor or the property of the estate. 3 COLLIER ON BANKRUPTCY, ¶ 362.03, p. 362-13 (15th ed. rev. 2001). "Property of the estate" consists of several broad categories. "Property of the estate" includes (with certain exceptions under § 541(b) and (c)(2)) "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U. S. C. § 541(a)(1)

26. Furthermore, under section 105(a) of the Bankruptcy Code, the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of chapter 11. The purpose of section 105(a) is "to assure the bankruptcy courts' power to take whatever action is appropriate or necessary in aid of the exercise

of their jurisdiction." 2 COLLIER ON BANKRUPTCY § 105.01 (15th Ed. Rev.). This is consistent with the broad, equitable authority of the bankruptcy courts. See, e.g., United States v. Energy Res. Co., 495 U.S. 545, 549 (1990). Among the equitable powers is the bankruptcy court's broad power to issue injunctions to enforce a stay, or even to reimpose a lapsed stay. See In re Wedgewood Realty Grp., Ltd., 878 F.2d 693, 701 (3d Cir. 1989).

27. Here, by the DOE's own admission to this Court, the Assignment is not effective until July 18, 2011. Therefore, the obligations under, and, presumably, the benefits of, the Contracts still reside with the Debtors. As such, the Debtors still have a "legal and equitable interest" in the Contracts. Any attempt by the DOE to effectuate the Assignment of the Contracts post-petition would directly impact the Debtors' ability to operate their business and would violate the automatic stay.

28. The Debtors respectfully request that the section 362 automatic stay be enforced to prevent the Assignment of the Contracts, which are essential to preserving the Debtors' business, property, and assets and to facilitating its plan of reorganization or liquidation, from be effectuated.

### B. Alternatively, the Non-Debtors Will Voluntarily Merge With the Debtors

29. In the alternative, the Debtors seek authority, pursuant to section 363 of the Bankruptcy Code, to merge the Debtors with the Northeast Entities.

30. In pertinent part, section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not articulate a standard to determine when a

court should authorize the sale or use of a debtor's assets outside the ordinary course of business, courts in this Circuit authorize such actions when the debtor demonstrates that the action is based upon its sound business judgment. *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that judge determining a section 363(b) application must find a "good business reason" to grant the application); *In re Lionel Corp.*, 722 F.2d 1063, 1068-69 (2d Cir. 1983) (same).

31. In evaluating whether a sound business purpose justifies the use, sale or lease of property under section 363(b) of the Bankruptcy Code, courts consider a variety of factors, which essentially represent a "business judgment test." *See* Collier on Bankruptcy ¶ 363.02 (15th rev. ed. 2008). In *In re Lionel Corp.*, the Court of Appeals for the Second Circuit listed several factors which a bankruptcy court may consider in its § 363(b) analysis:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, whether the asset is increasing or decreasing in value.

722 F.2d at 1071. In delineating these factors, the Second Circuit cautioned that "this list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge." Indeed, the *Lionel* Court expressly urged that: "[A] bankruptcy judge must not

be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code. As Justice Holmes once said in a different context, "[s]ome play must be allowed for the joints of the machine ...." To further the purposes of a Chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances. This is exactly the result a liberal reading of § 363(b) will achieve." *Id.* at 1069 (*internal citation omitted*).

32. That is precisely the case here. The Debtors are at the precipice of shutting the doors on a thirty-year business that saves the City of New York more than $10 million per year and provides the children of the City of New York with safe, prompt reliable service, all because of the unresolved Assignment issue. Since the DOE will not consent to an assignment of the Contracts back to the Debtors – which Mr. Moran is willing to do – the only alternative is to allow the Debtors to merge with the Northeast Entities, thereby bringing the assets back into the Debtors' estate. Moreover, pursuant to the 13th extension of the Contracts, at page 37, Mr. Moran need not seek the approval of the DOE to transfer his interest in the Northeast Entities to the Debtors. See Exhibit 4 annexed hereto. In addition to keeping the Debtors operating, this would allow the 1,188 bus drivers, escorts and shop workers to receive their paychecks that are now three days late. Thus, the Debtors' decision to use substantially all of their assets is amply supported by a sound business purpose.

## Motion Practice

33. This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of

their application to this Motion. Accordingly, the Debtors submit that this Motion satisfies Rule 9013-1(d) of the Local Bankruptcy Rules for the Eastern District of New York.

## Notice

34. The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee, (b) the creditors listed on the Debtors' consolidated list of 20 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions, (c) counsel to Comerica, the Debtors' secured lender, (d) counsel to the 1181 Amalgamated Transit Union's Welfare and Pension Fund, (e) counsel to the 1181 Amalgamated Transit Union, and (f) counsel for the New York City Department of Education. In light of the nature of the relief requested, the Debtors submit that no further or other notice is required or needed under the circumstances.

## No Prior Application

35. No previous request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully requests that this Court enter the order, substantially in the form attached hereto as Exhibit 5, enforcing the automatic stay as to the New York City Department of Education or, in the alternative, authorizing the Debtors to merge with the non-debtor Northeast Entities; and granting such other and further relief as is just and proper.

Respectfully Submitted,

Dated: July 12, 2011
New York, New York

/s/ Todd E. Duffy
Todd E. Duffy
Dennis J. Nolan
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 278-1000
Facsimile: (212) 278-1733
*Proposed Counsel to the Debtor and Debtor-in-Possession*